Good morning. Good morning, Your Honors. Eric Slepian on behalf of Kim Brown-Hunter. I'm going to try to reserve four minutes for rebuttal. Four minutes. Okay. We'll try to remind you, but it's your clock, so watch. Thank you. Okay? I appreciate that. As you're aware, Kim Brown-Hunter applied for her Social Security Disability benefits. She went through the entire administrative process and attended a hearing before an administrative law judge. What's subject to our discussion today is the decision from that judge that appears in the record at page 36 of the record. What's established in this case, Your Honor, is that Ms. Hunter suffers from a number of severe medically determinable impairments. That fact is conceded by the administration with an acknowledgement by the administrative law judge that she suffers from obesity. She has a body mass index of 41 to 44. She also has peripheral neuropathy, lumbar degenerative disc disease, diabetes, mellitus, and migraine headaches. During the hearing, she- One thing that concerns me is are we locked in by some sort of a regulation that obesity is a disease that can't be cured? Yes, we are. Well, not that it can't be cured. We are locked in by a regulation. It's cited. I think it's SSR00. Right. So here we have a case where no one has suggested an operation, no doctor. No doctor has suggested even chiropractic care or massages. The only person who's indicated some course of action was the pain relief doctor who said lose weight and exercise. Correct. So that doctor, at least, thought that she could cure herself. What do the regulations say is-I mean, obesity is sometimes psychological or otherwise, but here we have one doctor who's saying she could take care of it herself. What role should that play in our decision? Your Honor, we have to look at the specific policy ruling on obesity, and basically what it says is it's a medically determinable impairment. It recognizes the difficulty in losing weight, and it just says that it's one of those impairments that must be considered in combination. Now, the only time we could try to shy away from that is if there was obtainable treatment and that she was noncompliant in obtaining that treatment, and the policy ruling specifically states a recommendation of diet is not noncompliance. We're talking about where someone has access to specific methods and they're just refusing to do it, and that's not the case that we have in Kim Brown-Hunter. And to give you some history, Your Honor, there used to be a listing on this, and as you know, at Step 3, the listing would mean you're conclusively deemed disabled. Under that listing, if you met certain requirements, and I believe Ms. Brown-Hunter probably would based upon her hypertension in combination with the obesity, she would have been conclusively deemed disabled at that point. But we got rid of the listing and we replaced it with the policy ruling, and it shows that the administration is aware of the difficulties with obesity and how it can complicate matters. And that list, the Social Security ruling that I'm referencing, also says obesity in and of itself can still be disabling. You don't need other combined impairments. That may be true, but ultimately in this case, at least as I read the record, the ALJ did find there were some problems that your client had, but that her complaints were for the most part subjective, and when you look at the objective medical evidence, that contraindicated what she said subjectively. And under, I know you cite Smolin v. Chatter, but that was effectively overruled by Bunnell v. Sullivan, which is an en banc case. And under that standard, we're supposed to look at objective medical evidence and take that over subjective evidence, are we not? The short answer to your question is no, Your Honor, but let me explain the rationale behind that. So first I would tell you that I don't believe Bunnell overturned Smolin at all. Smolin's absolutely very good law. What Bunnell did is explain the law. And if we look at the holding in Garrison, that will certainly clarify that Bunnell does not overturn any particular law. And what they were focusing in on is that. I didn't mean to say it overturned it, but rather it clarified what the rule was. It's a different rule than what Smolin says. Well, I don't believe it's a different rule. In Bunnell, they didn't address the clear and convincing standard. It wasn't necessary to that particular holding. It wasn't even noted as a contention in that particular case. In Smolin, they did go through the standard. And we recently have Garrison, we have Burrell, and we have Trechner, and they all confirm the clear and convincing standard. And I would tell you it goes way, way back. We're talking about a one that's in the statute. Okay. Pursuant to 20 CFR section 404.1529, it says that we must look at these subjective complaints. And then in policy ruling SSR 96-7P, it says that subjective complaints can demonstrate possibility. Well, I don't. Perhaps I misspoke. I'm not saying that we don't take them into consideration. I'm saying that my understanding of the law is that if you have a subjective complaint, even if the ALJ credits it to some degree, but there is objective evidence that is contra, that tends to overcome it. For example, if somebody says, you know, I can't walk, and there's evidence that they walk around the block every day and they go on a hike every day, well, hey, you know, that's not going to work. Correct. If they come in and they say, I've got terrible, terrible pain, but the doctor orders them to take certain pain medications, they don't take it, that's evidence that tends to show that this is not going to work. And as I understand it, and I hope you can correct me if I'm wrong. Absolutely. That's really what we've got in this case. We've got a woman who's got some serious problems. There's no question about that. But as you know, this five-step procedure is a very tough one. Very tough one, except in certain parts of the country that are subjects of news reports these days. And unfortunately for your client, it appears that at step three, the evidence that she has put on is contradicted by medical or other objective evidence that suggests that she's either malingering in part or at least does not meet the standard of being disabled. What am I missing in the record here to show that? So let me step back. Okay. Because at step three, she agrees. She doesn't meet a specific listing and she's not conclusively being disabled at step three. So we're looking at step four. Okay. At step four, we have established that she suffers from medically determinable impairments that are expected to cause at least a degree of her symptoms. And so we have now gone beyond whether there's objective evidence to establish the impairment. You say that because you think the ALJ is so found? She is definitely so found. Okay. All right. Okay. She identified those severe impairments at page 40 of the record, and she said that they have more than a slight impact on Ms. Brown's ability to sustain work function. So that's a conceded point. So once we've established that, then the question is, is her pain complaints consistent with the record? And the examples you gave, there were clear conflicts where somebody was in pain or where she said one thing and she couldn't, and we don't have that here. And the case law is very clear that an administrative law judge, if she's going to reject symptoms that are causally related to an impairment, must set forth clear and convincing reasons. And we are limited to looking at just the reasons that the ALJ actually gave, right? We are. So why don't you just focus, because I think it's on ER 41, as I read it. There are only a handful of reasons the ALJ gave, and why don't you walk through why you think those don't suffice? My reading of that ALJ decision is there are no reasons that she set forth for discounting Ms. Brown Hunter's subjective complaints. Well, there are some reasons. You can quibble with whether they're substantial enough. But let's just look at the bottom of ER 41, right? I assume that's where you're going to direct us. All right. So at the bottom of ER 41, she's just talking about the history of Ms. Brown's impairment, and she's talking about what she indicated her symptoms were. The pain she has today. I'm sorry? The pain she has today. Correct. Correct. And so, you know, there's nothing, there's no indication as to why we're not believing Ms. Brown Hunter. And that's really the crux of this case. Well, what about ER 253 through 64, 288 through 388, and so on? For example, at least according to my notes, she reported pain, but the medical providers who specialize in pain management found her capable of all activities of daily living, found that she had good to adequate functionality and had good to adequate pain relief roughly 25 times from November 2006 through August of 2009. Now, I'm just skipping over the gentleman, but the ALJ cited the specific medical providers who reached those conclusions in that period. At ER 525, this is a visit to a pain specialist, your client, in quotes, denied neurological deficits, focal weakness, and dense numbness, and instead the doctor instructed her to restrict her activity. He counseled her to pursue an, in quotes, exercise regimen to promote weight loss. So, again, maybe at 40, 41, you don't have much there, but at least there are other indications in the record that what your client indicated, and I'm not quarreling that she's in distress, but for purposes of the statute and the regulations, it appears that the ALJ cited what medical providers, particularly in the pain management area, found, that what she reported and what they could determine objectively were two different things, and so they suggested that she do some things that they thought might be helpful to her but did not suggest that she was correct. So what am I missing on that? Is there something that you think has been misquoted from the record that's not in those pages that I talked about? So in virtually every record where there have been reference to adequate pain control or there's reference to an ability to perform activities of daily living, you will note that within that record, Ms. Brownhunter's reporting that she has to lie down a substantial amount of time during the day. That's one of the modalities that she's employing to reduce her particular pain. If she didn't, then obviously her pain complaints would be higher. It's based on the vocational expert testimony that that need to lie down during the day, for whatever reason, would preclude sustained work. So we can't just cut it out. We never got to step five, so we don't really know about that, do we? Well, yeah, the vocational expert testified to that. Okay, well, and what did the vocational expert say about your client's ability to perform a job in the national economy? Well, the vocational expert stated that if Ms. Brownhunter's pain is significant enough that she needs to rest or lie down periodically throughout the day, she'd be unable to sustain gainful employment. And that testimony is uncontradicted, and it's also consistent with policy ruling SSR 96-1. He was asked that question, and he made that response. And I suppose the question is whether the ALJ really believed she had to lay down every day, and especially when the doctors are saying she's responding well to pain and pain medication, at the very same time she's saying it gets worse. But as I understand your argument is that may be so, but he didn't use the ALJ didn't use the magic words. It's not a question of magic words, but clearly the ALJ didn't say it. So she didn't give us any reasons to really discount it. It has to be more clear, specific and convincing. Correct. And if I understand your argument correctly, whatever the case is, whatever the ALJ really believed, the ALJ did not say it in such a way that we can accept it because the ALJ did not give clear, specific and convincing reasons. Well, yes. One, the ALJ didn't say it at all, but the other point, and I don't want this Court to miss it, is that when you look, her pain, you know, when they say 5, 5 is her best pain. 9, 8, 7, 8, 9 is what this record tells us is her average pain. And her worst pain has repeatedly been a 10, and that's with employing rest and lying down. So, you know, when the ALJ says it's a 5, so on a particular day it may have been a 5, but, you know, and we gave the citations, it's a 7 to a 9 on average. But the ALJ didn't believe that, but what you're saying is the ALJ did not give clear, specific and convincing reasons for otherwise, for not believing her. I am saying that. Yeah. That the ALJ did not set forth any of those type of reasons. So if the ALJ, if there's some view that the ALJ didn't quite explain what the ALJ was trying to say, why wouldn't we just send it back and say, okay, this is what you're supposed to find. And now take another look at it and tell us whether it's right. The answer to that, Your Honor, is, well, there are a number of reasons. One, you're just giving the Commissioner an opportunity to reevaluate a claim. No, no, no, no. No, this is like, I mean, I don't have any suspicion that this is some conspiracy out there. The government's trying to take something away from your client. I'm just saying that we've made so many rules through our court and through the administration of what you have to do to not believe somebody that it's a very difficult. When I was a district court judge, I'm not sure that I ever thought of all of these things when I made credibility determinations. And now we have to, they have to set all of these up. And what I'm saying is, if I treat the ALJ as a person who's a competent individual, which I assume they are, well-trained, but they don't know quite how to explain themselves, why not give them a shot at trying to do it right and then get to the answer? Okay. So, you know, obviously, there's a lot of case law that says we shouldn't actually be doing that because you're just saying, look, the judge may not have addressed it, let's give the judge another chance. An applicant doesn't get that kind of an opportunity. And they're facing a lot of harm. I mean, she filed that. I think it was in 07. And a lot of time went by. And so, you know, in fact, in this record, we submitted records showing that she was losing her home. Record, there are citations to her losing her insurance. I mean, this poor lady. And no one, not a doctor, nobody, has suggested that this lady was malingering. And they all prescribed very strong narcotic pain medications, oxycodone, norentin. I mean, they all found that these complaints were so. To which the doctors thought that she had received a proper response, although she says she didn't. So there's some sort of a conflict there. But it strikes me that if we're trying to find truth, why not go find truth? I agree we should find truth. And we also need to be concerned about the interest of the disabled. And, you know, you had said something that interested me where you had indicated the courts are coming up with all these reasons. It's not. If you look at 404.1529, it specifically states, let's talk about her reputation for truthfulness. Let's talk about these conflicts. And it gives, I think there are seven of them, seven items that a judge has said. And she did nothing. They've done it to themselves. But we have not assisted in that in our caseload either. Okay. We've taken over time. We'll give you a little bit of time. Come back. Nothing like four minutes. Thank you. But we'll give you a little bit of time. Let's hear from the government, please. I appreciate it. Good morning, Your Honors. May it please the Court. My name is Jessica Milano on behalf of Acting Commissioner of Social Security. What is more persuasive in this case than what we've discussed yet is what is missing from this case. This case does not have any medical source opinions. Counsel was up here indicating that no physician has ever stated that Ms. Hunter was malingering. What do we do with that issue? She refused to see the doctor. She refused to see the doctor. It strikes me that we only get half the case if they won't cooperate in discovery. And I hadn't seen that before, where they just completely said, no, I'm not going to go see your doctor. What do we do with that? Right, Your Honor. I noticed that, too, and this is also the first time I've seen that. And that was Ms. Hunter addressed that specifically in her reply brief, stating that there was a reason she didn't attend the consultative examination, and that was because she stated that the commissioner wasn't following his or her own policies, needed to go to the treating physician first. And two points on that. First, that's not a requirement under the regulations. But second of all, we don't even reach that here because the evidence actually shows that the agency tried to send Ms. Hunter to her own treating physician for the consultative examination. It appears in the record at page 199, also at page 458, and also at page 466. So Ms. Hunter refused to go to the consultative examiner twice, and under the regulations, 404.1518, subparagraph A, the failure to attend a consultative examination can be grounds for finding that an individual is not disabled. And the regulations set forth good reasons to not attend a consultative examination, and Ms. Hunter has not met any of those exceptions. Roberts, counsel, can I ask you a question? I appreciate the point you're making there. But am I wrong in thinking that unless the ALJ mentioned that as a reason for not believing Ms. Hunter, that it's not relevant to our review? Your Honor, that's a good question. I'm glad you asked that. The ALJ did not mention this as a reason to find that Ms. Hunter's claims were not credible, nor is that what I'm saying. But the Court reviewed – when the Court reviews a case, the Court must consider the entire record as a whole, weighing both the evidence that supports and detracts from a claim. Well, that's true generally. But when it comes down to the narrow issue that's presented here, which is was the ALJ justified in not believing the claimant's testimony as to the severity, right? Right. The severity of the pain or whatever impairment she's suffering from were – Sure, but this – Let me just finish my question. I thought the law – and I want you to correct me if I'm wrong – I thought the law was that we needed to look only at the reasons the ALJ actually gave, and then we assess whether they meet the clear, convincing, and whatever the other catchword is, standard. So I guess if that's true, then I'd like you to point me to where in this ALJ decision I'm supposed to look to find the reasons, because I thought they were at the bottom of ER-41, and I didn't see anything else. So, first of all, am I right on the law? And if so, then take me through the ALJ's actual reasons and explain why you think they meet the standard. Right. Your Honor, what I think Ms. Hunter's position essentially turns the burden of proof around, and there's not a presumption that all subjective complaints must be accepted unless it can't be disproved. Rather, she still holds the burden of proof. She could have come forward with more evidence than this. She could have gone to a consultative examiner. She could have requested her own physician fill out paperwork or assist her in some way. As far as the reasons stated for finding that her claims were not entirely credible – So, what does the ALJ actually give us in terms of the reasons, and then let's just analyze them and see if they meet the standard? Isn't that what we're supposed to do? Sure. And we can do that. Well, is there something else we're supposed to do besides that? No, Your Honor. I didn't mean to suggest otherwise. Okay. Then I guess what I'm confused is that you keep saying, well, she bore the burden and she didn't do this, she didn't do that. There is an absence of this, there's an absence of that. But – and I say, okay, all that might be true. But if the law says we're supposed to just look at the reasons the ALJ actually gave, then my response is, so what? These other things you're talking about, tell me about the reasons the ALJ actually gave and we'll look at those. The ALJ went through the evidence at pages 41, 42, and 43. And the ALJ gave a summary of the evidence with her findings, and she noted that Ms. Hunter's condition improved with medications, that she consistently reported that she was doing well and she was stable on her current medications. Ms. Hunter went to monthly appointments, essentially. These were medication management appointments. These were pain management appointments. And she consistently reported that she was doing well. She'd been doing well for years. She was on the same medications for years. There was never more – these were fairly conservative. There was never any recommendations for surgery. There was never any further treatment sought or suggested by these physicians. The ALJ noted that there was no surgery has been performed. The ALJ also noted that in 2010, one of her physicians noted that she should exercise. That's quite the opposite of opining that Ms. Hunter had restrictions. This physician thought that Ms. Hunter was capable of functioning and suggested she exercise. Yeah, but, I mean, the problem I have, I'll just be frank with your position here, is that the key impairment that Ms. Hunter is complaining about or that restricts her ability to work is that she needs to lay down several times a day, right? And the vocational expert testified quite unequivocally that somebody with that limitation, there is no work out there that they can do, okay? So the ALJ had to say, I don't believe you, Ms. Hunter, when you're telling me that you have to lay down several times a day. And so all I'm trying to do is figure out what reasons did the ALJ give for not believing that testimony. And if they don't meet the clear and convincing standard, then I think your client or the government here has to lose. And just focus on that, and I guess maybe I'll be more receptive to your position. Your Honor, are you saying that the ALJ was required to state specifically why she could not, she didn't need to nap? No. Okay. Why she was not believing, why she found Ms. Hunter not credible in terms of explaining the severity of the impairment she suffered from. And so I look at the specific things the ALJ says at the bottom of the R41, and they don't strike me as inconsistencies. They don't strike me as something that indicates a person came in here and lied when they got on the, well, I don't know if you get on the stand in these proceedings, but when she testified. Right. Your Honor, at the bottom of page 41, similar to this Court's observation in a recent case, Trachler, this is just the ALJ's conclusion. It's in the next two pages that the ALJ explains her findings and supports it. Okay. So point me. I got it right in front of me. Just point me to the specific language you want me to look at. Okay. On page 42, in the third and fourth paragraphs, the ALJ noted that her medications were working well. Wait, wait. ER 42? I apologize. Because there's those two numbers. So tell me which ER page. If we're looking at the administrative record number, which would be in the bottom right-hand corner. Got it. What page? 42? Yes. Okay. So the third and the fourth paragraphs, the ALJ noted that her blood pressure had improved. In the fourth paragraph noted that she was doing okay on her pain medications and had no new symptoms. She wrote, she reported her medications were working well. I think at the top of that page, at page 42, what we're seeking for is whether or not the ALJ was sufficient when the ALJ said, after careful consideration of the evidence, I find that the claimed medical determinable impairments could reasonably be expected to cause some of the alleged symptoms. However, the claimant's statements concerning the intensity, persistence, and limiting effect of those symptoms are not credible to the extent they are inconsistent with the above residual function capacity assessment. And the question is, is that sufficient under the regulations and under the law for us to accept the ALJ's statement? Your Honor, no. I believe that that is her conclusion, and she set it forth. And it's the ensuing discussion afterwards. From pages what to what? If we're looking at the bottom right-hand corner again, pages 42 and 43. So you're saying that the statement made at the top of 42 is the conclusion, and then the outline for the reasons for that conclusion are at 42 and 43? Yes, Your Honor. And that's something that this Court recently observed an ALJ commonly does in the Trickler case. And this is similar to Reddick v. Chatter, which is 157 F. 3rd. 715, Ninth Circuit 1998 case. But in that case, the Ninth Circuit held that the ALJ may adequately articulate findings by setting out a detailed and thorough summary of the facts and stating conflicting evidence, stating interpretations, and making findings. So that's my problem with your — I just read the paragraphs you wanted me to read, and they are just a descriptive summary of what was in the record. There's no attempt there to explain why what even the description that's given is inconsistent with the impairments that Ms. Hunter described in her testimony. That's what the ALJ is required to give, or you're supposed to give reasons for why you disbelieve someone. This is just a description of the relevant medical evidence that was introduced at the — as part of the proceeding. Right. But the evidence simply did not reach the level of severity of her claims. In turning to the next page — Well, let me just be sure I'm looking at the right thing. I'm looking at page 44. And although the ALJ did on pages 42 and 43 of the record go through and talk about what each doctor said, she says, After careful consideration of the entire record, including the medical evidence and the testimony at the hearing, I find the functional limitations resulting from the medical evidence supports a finding that claimant's impairments, while imposing some restrictions, did not prevent her from engaging in all work-related activities. In sum, the above residual functional capacity assessment is supported by the objective medical evidence. The evidence fails to establish that the claimant has limitations in her ability to function great enough to prevent her from performing all substantial gainful activities for any 12-month period. I don't know what more — I mean, I could have said it a lot longer, but she reviews the evidence. She says, in considering that, she finds that there's no objective medical evidence that rises to the level of what Ms. Hunter was claiming. And under the circumstances, her assessment is not supported by objective medical evidence, and therefore, and the limitation is not as great, and therefore, she's ruling against her. So there is a conclusion. There is a review of the evidence that's there. It's not just a conclusory statement. Is that correct? I agree, Your Honor. Well, that's not — that's not quite correct, because if to the extent the ALJ is saying that Ms. Hunter had to come forward with objective medical evidence to prove the severity of the impairment she's complaining about, the ALJ was just wrong on the law, right? No. There's two requirements. The first is — essentially occurs at Step 2, where an ALJ is considering whether or not an impairment is severe. And that's when objective medical evidence is required. And the ALJ found that she had come forward with objective — Yes. Right. So then when you get to the severity, you don't have to come forward with objective medical evidence to support the severity. You can rely solely on your own testimony. Right. But it is still a factor that the ALJ came to consider. Right. And then the ALJ has to give reasons for disbelieving your testimony as to the severity. Right. And here the course of treatment, the reports of improvement, and the relatively benign objective medical evidence did not support the severity that she alleged. Okay. Other questions? No? Thank you very much. Counsel, we're going to give you a minute. We took you way over, so you had lots of time to answer questions. We'll give you an extra minute to respond. Thank you. I appreciate that. So I would point the court to the case of Moisa V. Barnhart at 367 F3D 882, because these facts are very similar to that particular case. But I wanted to talk a little bit about the burden, because that really just came up when counsel was speaking. Ms. Brown-Hunter established she suffers impairments that prevent her from performing her past relevant work. The burden she that means she put on a prima facie case of disability, and the burden has now shifted to the commissioner to show that she's able to sustain full-time competitive work. So that burden was met. Or limited. Say it again? Not full-time work, necessarily. Yes. In order to be found I mean, limited. Even though she can't do her full-time work, if she can work full-time at some different profession or work. If the commissioner is able to establish that she can perform other full-time work. But it's their burden, not our burden. We've already established an inability to sustain employment. Okay. We have reached this one-minute deal. I realize that you could say a whole lot more. We thank both counsel for their help to us in this case. The case just argued is submitted.
judges: Wallace, Smith, Watford